E-FILED
Wednesday, 31 March, 2010  03:18:46 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

JASON M. GADDIS,
            Plaintiff,

v.                                                          08-1067

ROGER E. WALKER, JR. et al.,
            Defendants.

## MEMORANDUM OPINION AND ORDER

Before the court are the defendants, Sandra Hill, Dr. Sylvia Mahone, Dr. Liping Zhang, and Dr. Olukunle Obadina's summary judgment motion [87], the plaintiff's response [99] and the defendants' reply [97], the defendants, Jon Deal, Kerri Mehenkens, Teresa Kisro, Tracy Maue, Brian Fairchild, Terri Anderson, Roger E Walker, Jr, Eddie Jones, John Birkel, Christine Beasley, Steve Smith, Patrick Hastings' summary judgment motion [89], the plaintiff's response [93] and the defendants' reply [95].

## BACKGROUND

Plaintiff has filed his complaint in regards to medical care he has received while in the Illinois Department of Corrections. Specifically, plaintiff alleges the defendants have been deliberately indifferent to a serious medical need in regards to an inguinal hernia. Plaintiff has been incarcerated in the Illinois Department of Corrections continuously since 1996. In late January of 2006, plaintiff felt a sharp pain in his groin while moving boxes in his cell at the Lawrence Correctional Center. The plaintiff makes allegations against Wexford Health Sources, Inc. for its role in the development of medical/clinical policies within the Illinois Department of Corrections. Plaintiff has specified that his complaint with Wexford is the fact that he had to continue to pay a $2.00 co-pay for his follow-up visits in regard to his hernia.

## UNDISPUTED MATERIAL FACTS[1]

1.    At all relevant times, plaintiff was incarcerated within the Illinois Department of Corrections. (See complaint generally).
2.    In late January 2006, plaintiff suffered what turned out to be an inguinal hernia. (Plaintiff's dep. pg. 10).

---

[1]For facts 1-73, the exhibits can be found attached to defendants' summary judgment motion [87]. For the remaining facts, the exhibits can be found attached to defendants' memorandum of law [90]

3.      Plaintiff put in for nurse sick call but before he was able to be seen, he was transferred to the Henry Hill Correctional Center in Galesburg, IL. (Plaintiff's dep. pg. 10).  Plaintiff was incarcerated at Hill Correctional Center from February of 2006 until October of 2006. (Exhibit A, p. 8 attached to defendants' memorandum of law [90]).

4.      Plaintiff was seen and evaluated by a doctor at the Hill Correctional Center. (Plaintiff's dep. pg. 11).  The doctor provided the plaintiff with Tylenol and diagnosed the plaintiff with an inguinal hernia. (Plaintiff's dep pg. 11).  The doctor at the Hill Correctional Center also provided plaintiff with a hernia belt.  (Plaintiff's dep pg. 11).

5.      The doctor at the Hill Correctional Center did not prescribe the plaintiff surgery. (Plaintiff's dep. pg. 13).  In March 2007, the plaintiff was seen by a doctor at the Pontiac Correctional Center.  (Plaintiff's dep pgs. 20-21).

6.      Plaintiff describes Dr. Zhang as an older gentleman of African descent. (Plaintiff's dep. pg. 21).

7.      During this visit, the plaintiff testified that his hernia was about the same size as it was in the beginning. (Plaintiff's dep. pg. 22).

8.      Plaintiff knows of two other inmates who have received surgery for their inguinal hernias while incarcerated at Pinckneyville Correctional Center. (Plaintiff's dep. pg. 32).

9.      The medical records state that Mr. Jason Gaddis was seen for reception screening on October 25, 2006.[2] (Exhibits A and A-1.)

10.     The medical records reflect that the Plaintiff made no complaints at the time of his intake screening.[3] (Exhibits A and A-1.)

11.     Mr. Gaddis first made complaints regarding the hernia complained of in his complaint on March 25, 2007[4]. (Exhibit A.)

12.     On that date, Plaintiff made a sick call request that stated, "I need to see about my hernia. It hurts." (Exhibits A and A-2.)

13.     Subsequently, on March 27, 2007, the Plaintiff was seen by Dr. Vade in the M.D. sick

---

[2]Plaintiff disputes this fact by stating the medical records have somehow been falsified. However, he does not dispute that the medical records are accurately quoted in defendants' summary judgment motion.  Even assuming that plaintiff is correct that the medical records have someone been falsified, this in no way indicates that any of the defendants have been deliberately indifferent to his serious medical needs.  Further, plaintiff offers no proof that any defendant falsified the medical records, nor does he offer any proof that the medical records have in fact been falsified.

[3]As in fact number 9, plaintiff disputes this fact based on his allegations that the medical records have been falsified.  Once again, plaintiff offers no proof that any defendant falsified the medical records, nor does he offer any proof that the medical records have in fact been falsified.

[4]Plaintiff disputes this fact based on his submission of grievances and other written correspondence in regards to complaints of his hernia.  However, it is undisputed that the plaintiff's medical records do not indicate any complaints being made by the plaintiff regarding his hernia prior to March 25, 2007.

call line. Dr. Vade's note from that date states as follows:

> S (subjective) Patient here complaining of left inguinal hernia
> since February 06. It bothers him when he (illegible). Admits he is
> able to push back.
> O (objective) Alert and oriented X 3. Vital signs within normal
> limits. Left inguinal hernia – small 2" x 1/2". Reducible.
> A (assessment) As above.
> P (plan) Tylenol 325 mg. Patient educated about hernias. No
> medication at present. (Exhibits A and A-2.)

14.     On this date, Plaintiff was complaining to Dr. Vade regarding his hernia. Dr. Vade examined him and found him to have a small, reducible hernia for which he prescribed Tylenol.  Dr. Vade found that no other medication was necessary and educated the Plaintiff about hernias.  (Exhibit A.)

15.     The next entry in the Plaintiff's medical records is from May 4, 2007.  On that date it appears the Plaintiff was suffering from a headache and was evaluated by a nurse for his complaints.  (Exhibits A and A-3.)

16.     On June 13, 2007, Sylvia Mahone, M.D. evaluated the Plaintiff for his complaints regarding his hernia.  Plaintiff was originally seen on this date by a nurse.  Her note states as follows:

> RN Note:
> O (objective) Hernia left lower abdomen getting larger and causing
> pain.
> A (assessment) Hernia. (Exhibits A and A-4.)

17.     Subsequently, Plaintiff was referred to Dr. Mahone. Her note from that date states as follows:

> S (subjective) Hernia since 5/06. Had a hernia belt previously – it
> is in his property.
> O (objective) Vital signs as above. Left inguinal hernia 2 ½ x 2 ½.
> Easily reducible. Waist: 30 ½".
> A (assessment) 1) left inguinal hernia.
> P (plan) 1) Tylenol 325 mg 2 tablets by mouth twice a day as
> needed, #24 – 2 refills; 2) hernia belt – waist 30 ½". (Exhibits A
> and A-4.)

18.     On this date, Dr. Mahone evaluated the Plaintiff during his urgent care visit for complaints of a painful hernia.  Dr. Mahone's assessment was the Plaintiff had an easily reducible 2 ½" x 2 ½" inguinal hernia.  Dr. Mahone prescribed the Plaintiff pain medication and a hernia belt in order to help alleviate his problems.  (Exhibit A.)

19.     Dr. Mahone next saw the Plaintiff on June 19, 2007.  Her note from that date states as follows:

> MD Note:
> Hernia causing a lot of pain when stair climbing.
>
> P (plan) 1) Low gallery permit for 1 years 6/19/07 to 6/19/08.
> (Exhibits A and A-5.)

3

20. On this date the Plaintiff was seen regarding his complaints of his hernia causing him pain when he was climbing stairs. As a result, Dr. Mahone provided Plaintiff a low gallery permit for one year. A low gallery permit assured that the Plaintiff would be celled on a ground floor as to minimize the amount of stairs he would have to climb on a daily basis. (Exhibit A.)

21. This was the final time that Dr. Mahone treated the Plaintiff while at the Pontiac Correctional Center. Plaintiff was seen on two other occasions in the healthcare unit prior to being transferred to the Pinckneyville Correctional Center on September 26, 2007. (Exhibit A.)

22. Plaintiff's visits following our last visit were in regards to a cold from which the Plaintiff was suffering and a vaccine provided to the Plaintiff. (Exhibit A.)

23. Dr. Mahone had no involvement in the Plaintiff's care subsequent to June 19, 2007. (Exhibit A.)

24. Plaintiff's hernia was treated conservatively with pain medication. He was issued a hernia belt and a low gallery permit. (Exhibit A.)

25. During the time that Dr. Mahone treated the Plaintiff, his hernia did not require surgery in her medical opinion. (Exhibit A.)

26. Dr. Mahone is not aware of any IDOC policies which would prohibit a prisoner from receiving hernia surgery recommended and approved by the correctional facility's Medical Director. (Exhibit A.)

27. Wexford Health Sources, Inc. does not have a policy forbidding surgery for inmates suffering from an inguinal hernia. The decision to recommend surgery for an inguinal hernia is at the discretion of the treating physician. (Exhibits A, B, and D.)

28. When Dr. Mahone observed the Plaintiff's condition, his hernia was reducible and non-emergent. (Exhibit A.)

29. Dr. Mahone advised the Plaintiff that should his hernia become irreducible, surgery might be recommended at that point. Plaintiff was transferred to the Pinckneyville Correctional Center on September 23, 2007. (Exhibit A.)

30. Each time the Plaintiff was examined while under Dr. Mahone's care, the hernia continued to remain reducible. (Exhibit A.)

31. In Dr. Mahone's medical opinion, the Plaintiff was treated appropriately with conservative measures while at the Pontiac Correctional Center. (Exhibit A.)

32. Once the Plaintiff left the Pontiac Correctional Center, he was no longer under the care of Dr. Mahone, nor the care of anyone else affiliated with the Pontiac Correctional Center. (Exhibit A.)

33. Each time the Plaintiff made complaints, he was given additional pain medication or other medical treatment to address his immediate needs.[5] (Exhibit A.)

34. Upon review of the Plaintiff's medical records, it is apparent that Liping Zhang, M.D. did not see or treat the Plaintiff for his medical needs during the time that he spent

---

[5]Plaintiff disputes this fact because his lower gallery permit and hernia truss were not provided at Pinckneyville Correctional Center. This assertion however does not dispute the assertion made in this fact.

4

incarcerated at the Pontiac Correctional Center.  (Exhibit B.)

35.     Furthermore, Dr. Zhang is a female of Asian descent.  (Exhibit B.)

36.     Dr. Zhang made no evaluations of the Plaintiff for his inguinal hernia.  (Exhibit B.)

37.     The medical records indicate the Plaintiff was seen for reception screening on September 26, 2007.  (Exhibits C and C-1.)

38.     On October 2, 2007, Plaintiff was seen in the healthcare unit at the Pinckneyville Correctional Center complaining of a common cold. (Exhibits C and C-2.)

39.     Additionally, Plaintiff made complaints that he was suffering a hernia and that he needed his belts.  This note was authored by the licensed practical nurse in the healthcare unit at the Pinckneyville Correctional Center.  (Exhibits C and C-2.)

40.     As a result, the Plaintiff was referred to the MD call line for October 5, 2007.  Olukunle Obadina, M.D.'s note from that date states as follows:

> S (subjective) "I have a hernia. I have to pay $2 for Tylenol. I used have a hernia belt."
> O (objective) Easily reducible left inguinal hernia even in the erect position. Non-tender hernia ring.
> A (assessment) Easily reducible left inguinal hernia.
> P (plan) No need of truss. Tylenol – take as needed for pain. See every 3 months for hernia check. (Exhibits C and C-3.)

41.     On this date, Dr. Obadina saw the Plaintiff in regards to his complaints of his inguinal hernia.  Dr. Obadina noted that the hernia was easily reducible even when he is standing up.  Additionally, Dr. Obadina noticed that the hernia was non-tender.  At this time Dr. Obadina's assessment was that the Plaintiff did not require a truss to treat his hernia and Dr. Obadina prescribed him Tylenol to be taken as needed for pain.  Additionally, Dr. Obadina ordered the Plaintiff be seen every three months by Dr. Obadina to evaluate and monitor his hernia.  At this time Dr. Obadina found that Plaintiff's hernia did not require surgery and was not an emergency situation.  (Exhibit C.)

42.     The next entry in the Plaintiff's medical records is dated December 8, 2007.  This note is authored by LPN Karen Boyd.  It is noted that the Plaintiff signed up for nurse sick call on this date, but apparently went to work instead.[6]  (Exhibits C and C-4.)

4       3. On December 22, 2007, the Plaintiff was again seen by a licensed practical nurse. That note states as follows:

> S (subjective) "I had a past hernia problem and they said they can't do surgery which is fine but I was getting off the top bunk a few days ago and hurt it. I got nauseous and had to push it back in."
> O (objective) Last seen with hernia complaints 10/5/07.
> Self-reports told correctional officer when hurt self and was not called to healthcare unit for evaluation. No pain/complaints to

---

[6]Plaintiff disputes having had a job at that time, but he does not dispute that defendants are not quoting the medical records correctly.  Further, the reason he did not show up for the sick call would not be relevant.  He could have preferred to sleep in or go to the law library. Regardless of the reason, he did not show up for the nurse sick call for which he signed up.

abdomen at this time. Self-reports has Tylenol and takes when
needed. Self-reports pushed hernia back in.
A (assessment) Alteration in comfort.
P (plan) 2 voucher signed. Refer to physician's assistant for
evaluation. Supposed to follow up every 3/12 months for hernia
check. Last seen 10/5/07. (Exhibits C and C-5.)

44.     As a result of the visit with the licensed practical nurse, the Plaintiff was seen by a
physician's assistant on December 27, 2007. That note states as follows:
S (subjective) Nursing referral from 12/22/07. Patient states, "My
hernia popped out two weeks ago and I had to push it back in."
"I'm fine today." Patient with history of left inguinal hernia – seen
10/5/07 by Medical Director and follow up scheduled.
O (objective) General: Alert and oriented x 3, no acute distress.
Lungs clear bilaterally; CV regular; vital signs within normal limit.
GU: penis – nodischarge/ blood/lesions. Testes: non-tender, no
nodule/mass. No LAD – small left inguinal hernia noted – easily
reducible.
A (assessment) History of left inguinal hernia.
P (plan) 1) Discussed hernias; 2) Avoid any aggravating activity;
3) patient seen by Medical Director 10/5/07 and follow up ordered
– observation for follow-up with Medical Director as previously
ordered. (Exhibits C and C-6.)

45.     On this date, the Plaintiff was seen by a physician's assistant with regards to complaints
of his hernia.  Plaintiff complained that two weeks prior to this visit, his hernia popped
out and he had to push it back in.  Plaintiff was given a full physical exam by the
physician's assistant.  The physician's assistant's assessment was that the Plaintiff had a
small, easily reducible inguinal hernia and ordered the Plaintiff to follow up with Dr.
Obadina as Dr. Obadina had previously ordered on October 5, 2007.  (Exhibit C.)

46.     On January 7, 2008, Dr. Obadina again saw the Plaintiff during Dr. Obadina's MD call
line.  Dr. Obadina's note from that date states as follows:
S (subjective) "I have a hernia."  "You said you will see from time
to time."
O (objective) Has a left inguinal bulge on erect position consistent
with left inguinal hernia.  The hernia is reducible in erect position
and disappears in supine position.
P (plan) 1) Follow up in MD call line in 90 days; 2) Take Tylenol
as needed for pain.  (Exhibits C and C-7.)

47.     On this date, Dr. Obadina evaluated the Plaintiff on a regularly-scheduled follow-up visit
to monitor his left inguinal hernia. At this time, the hernia was reduced and the Plaintiff
reported to Dr. Obadina that he continued to be able to reduce the hernia. Dr. Obadina

ordered that the Plaintiff return again for a follow-up visit in ninety days and that he be
given Tylenol to be taken as needed for pain.  (Exhibit C.)

48.     This was the final time that Dr. Obadina saw the Plaintiff prior to his filing his Complaint

on March 13, 2008.  (Exhibit C.)

49.     Dr. Obadina continue to evaluate the Plaintiff on a regular basis for his hernia.  (Exhibit C.)

50.     The medical records reflect that Dr. Obadina next saw the Plaintiff on May 7, 2008.  Dr. Obadina's note from that date states as follows:

> S (subjective)  Inmate is here for follow-up left inguinal hernia.
> No abnormal pain.  No dyspepsia.  No vomiting.
> O (objective) Left reduced inguinal hernia.  Easily reducible even
> in erect position.
> A (assessment) Uncomplicated left inguinal hernia.
> P (plan) Continue follow-up in six months or as needed if there is
> pain, tenderness, vomiting, or irreducibility. (Exhibits C and C-8.)

51.     On this date, Dr. Obadina again followed up with the Plaintiff to monitor his inguinal hernia.  Plaintiff's hernia remains easily reducible and uncomplicated.  The plan is to continue to monitor the Plaintiff's situation and for him to immediately report to the healthcare unit if he experiences pain, tenderness, vomiting, or irreducibility.  (Exhibits C and C-8.)

52.     On November 7, 2008, Dr. Obadina again followed up with the Plaintiff for his complaints on inguinal hernia.  Dr. Obadina's note from that date states as follows:

> S (subjective) Inmate is here for follow up of left inguinal hernia.
> O (objective) Small inguinal bulge in the erect position.  It is easily
> and fully reducible in the erect position.  In supine position, there
> is no visible bulge at all.  It is easily reducible.
> A (assessment) Uncomplicated left inguinal hernia.
> P (plan) 1) Inmate was educated about the pathology of hernias; 2)
> told to return if swelling does not reduce in supine position or if
> there is abnormal pain, vomiting, and nausea; 2) Inmate voiced
> understanding and says, "I appreciate it." (Exhibits C and C-9.)

53.     On this date, Dr. Obadina again evaluated the Plaintiff and monitored his inguinal hernia.  Once again Dr. Obadina found the hernia to be easily reducible and education the Plaintiff as to what conditions he should inform the healthcare unit of immediately.  Plaintiff voiced that he understood and stated that he appreciated Dr. Obadina's help with his problem.  (Exhibit C.)

54.     Plaintiff's hernia was treated conservatively with pain medication.  He was issued at varying times a hernia belt and a low bunk permit.  While he was incarcerated at the Pinckneyville Correctional Center, Plaintiff was able to work and did not require the use of a hernia belt.[7]  (Exhibit C.)

---

[7]The plaintiff disputes this fact by stating he was never given a low bunk permit, only a low gallery permit and that he could not have a low gallery permit while at Pinckneyville and he was not allowed to have a hernia belt at Pinckneyville.  However, the plaintiff's assertions do not undermine Dr. Obina's medical opinion that he was treated conservatively or Obina's assessment that the plaintiff was able to work if he so chose.

55. During the time that Dr. Obadina treated the Plaintiff, his hernia did not require surgery in Dr. Obadina's medical opinion. (Exhibit C.)

56. Dr. Obadina is not aware of any IDOC or Wexford policies that would prohibit a prisoner from receiving hernia surgery recommended and approved by the correctional facility's Medical Director. (Exhibit C.)

57. It is Wexford's policy to allow the treating physician and medical director to make the decision of whether an inmate with an inguinal hernia is to undergo corrective surgery. Corrective surgery on an inguinal hernia poses certain risks to the recipient. (Exhibit C.)

58. When Dr. Obadina observed the Plaintiff's condition, his hernia was easily reducible and non-emergent. (Exhibit C.)

59. Dr. Obadina advised the Plaintiff that should his hernia become irreducible, surgery might be recommended at that point. In Dr. Obadina's medical opinion, the Plaintiff was treated appropriately with conservative measures while at the Pinckneyville Correctional Center. (Exhibit C.)

60. Each time the Plaintiff made complaints, he was given additional pain medication or other medical treatment to address his immediate needs. Further, Dr. Obadina evaluated the Plaintiff, and continue to evaluate the Plaintiff, on a regular basis to monitor his inguinal hernia. (Exhibit C.)

61. In Dr. Obadina's medical opinion, the costs and risks associated with surgery on the Plaintiff's hernia outweigh the benefits surgery would provide. (Exhibit C.)

62. Plaintiff was grieving that he was not given a continued supply of pain relievers or a low gallery permit. (Exhibit D.)

63. On November 23, 2007, Sandra Hill, R.N. reviewed the Plaintiff's medical records to address the Plaintiff's complaints. (Exhibit D.)

64. Upon Sandra Hill's review of the medical chart, there was no indication that the offender had requested a low gallery permit from anyone in the healthcare unit and Pinckneyville Correctional Center. (Exhibit D.)

65. Additionally, Sandra Hill noted the Plaintiff had been seen by the Medical Director, as well as in the nurse sick call at the healthcare unit at the Pinckneyville Correctional Center. Plaintiff did not mention any complaints of pain at those times. As such, Plaintiff did not qualify as being in "chronic pain."[8] (Exhibit D.)

66. Finally, Sandra Hill advised that if the Plaintiff wished to address his issue with the low gallery permit or his pain problem, he needed to go through the nurse sick call process. (Exhibit D.)

67. Sandra Hill did not personally treat the Plaintiff at any time that he was incarcerated at the Pinckneyville Correctional Center. (Exhibit D.)

68. Sandra Hill did not deny the Plaintiff a low gallery permit. (Exhibit D.)

69. Sandra Hill did not have the authority to grant the Plaintiff a low gallery permit. (Exhibit

---

[8]Plaintiff disputes this fact by stating that he was prescribed Tylenol on one occasion (to take as needed for pain) by Dr. Obadina. Based on the medical records and plaintiff's lack of proof and one recommendation to take Tylenol as needed, the court finds that the plaintiff's attempt to dispute this fact fails.

D.)

70.    Sandra Hill did not have the authority to grant or deny the Plaintiff's surgery on his inguinal hernia.  (Exhibit D.)

71.    If Plaintiff was experiencing pain, it was an issue that needed to be addressed through the nurse sick call process.  (Exhibit D.)

72.    Sandra Hill did not, in her capacity as Director of Nursing, have the authority to waive an inmate's obligation to pay the $2.00 co-pay required by I.D.O.C. rule.  (Exhibit D.)

73.    The plaintiff's allegation against Wexford is that Wexford has a policy that hernias are not named as a chronic issue.  (Plaintiff's dep. pg. 45).

74.    Plaintiff is also alleging that Wexford has a policy not to provide surgery for inguinal hernias.  (Plaintiff's dep. pg. 46).

75.    Plaintiff admits that no doctor has ever told him that he needs surgery for his hernia.  (Plaintiff's dep. pg. 47).

76.    Defendant Birkel is a Corrections Medical Technician ("CMT") at Pontiac Correctional Center.  (Exhibit B, Birkel Affidavit).

77.    Defendant Beasley is a Corrections Medical Technician ("CMT") at Pontiac Correctional Center.  (Exhibit C, Beasley Affidavit).

78.    Steve Smith is a Correctional Counselor at Pontiac Correctional Center.  (Exhibit D, Smith Affidavit).

79.    Patrick Hastings is a Correctional Counselor at Pontiac Correctional Center, where he is assigned as a Grievance Officer.  (Exhibit E, Hastings Affidavit).

80.    Jon Deal is a Correctional Officer at Pontiac Correctional Center. (Exhibit F, Deal Affidavit).

81.    Korri Mehrkens is a Correctional Office at Pontiac Correctional Center.  (Exhibit G, Mehrkens Affidavit).

82.     Eddie Jones is the former Warden of Pontiac Correctional Center from April 1, 2006 through May 27, 2008 and is currently Deputy Director of District #2 for the Illinois Department of Corrections.  (Exhibit H, Jones Responses to Interrogatories).

83.    Teresa Kisro is a Correctional Counselor II at Pinckneyville Correctional Center.  (Exhibit I, Kisro Affidavit).

84.    Tracy Maue is a Correctional Counselor at Pinckneyville Correctional Center.  (Exhibit A, p. 66).

85.    Brian Fairchild is an Administrative Review Board Chairperson with the Office of Inmate Issues.  (Exhibit J, Fairchild Affidavit).

86.    Plaintiff's hernia belt was removed from his personal property when he was transferred to Pontiac Correctional Center.  (Exhibit A, p. 22).

87.    A hernia support belt is considered unauthorized unless it has been issued or ordered by medical staff at Pontiac Correctional Center.  (Exhibit H, ¶3).

88.    Defendant Deal reviewed Plaintiff's personal property on November 5, 2006 and determined his hernia belt was unauthorized property and considered contraband, along with several other items.  (Exhibit F, ¶6).

89.    Defendant Deal determines whether or not property is contraband in accordance with the policies in place at Pontiac Correctional Center.  Defendant Deal did not, and does not,

determine what property qualifies as contraband and relies upon the facility's policies. (Exhibit F, ¶5).

90. Defendant Deal did not have any contact with Plaintiff following the confiscation of his hernia belt and did not have the authority to provide Plaintiff with personal property that was determined contraband at Pontiac Correctional Center. (Exhibit F, ¶7).

91. Plaintiff admits Defendants Deal and Mehrkens do not determine what property is unauthorized. (Exhibit A, pp. 63-64).

92. Defendant Jones did not have any personal involvement with the facts and occurrences alleged in Plaintiff's Complaint. (Exhibit H, ¶¶1,2).

93. If Defendant Jones had been made aware of Plaintiff's medical issues, Plaintiff's issues would have been addressed by medical professionals who would have determined the appropriate treatment for his medical problems. Defendant Jones did not determine the policies or rules regarding treatment of an inmate's chronic medical problems. (Exhibit H, ¶9).

94. Defendants Birkel and Beasley, as CMTs are not physicians or nurses and are not trained or licensed to diagnose medical conditions or to prescribe medication or a particular course of treatment, nor do they have the authority to override a treating physician's course of treatment. (Exhibit B, ¶¶6, 7, Exhibit C, ¶¶8, 9).

95. Defendants Birkel and Beasley assess offenders who request to be seen by a medical technician. (Exhibit B, ¶4, Exhibit C, ¶4).

96. Emergency treatment and care for chronic conditions are available outside of the sick call process. In an emergency situation, Health Care personnel are notified by cell house staff to respond to the cell house or the offender is transported to the Health Care Unit for treatment. Offenders suffering from specified chronic conditions are monitored by the facility's physicians in regularly scheduled clinics. (Exhibit B, ¶3).

97. If an offender is not diagnosed with a chronic condition, the offender is required to sign a $2.00 co-payment voucher in order to be scheduled for sick call. (Exhibit C, ¶4).

98. An inguinal hernia was not considered a chronic condition exempting treatment from the $2.00 co-payment in 2007. (Exhibit C, ¶6).

99. Correctional Counselors typically conduct the first review of an offender's grievance. If an offender disagrees with the Counselor's response, the offender has the ability to appeal his grievance to be reviewed by a Grievance Officer. If the offender disagrees with the Grievance Officer's recommendation, and the Chief Administrator's response, the offender may appeal his grievance to the Administrative Review Board. If the grievance is related to a medical issue, the grievance is typically directed to the attention of the Health Care Unit. (Exhibit D, ¶4).

100. Defendant Smith did not determine Plaintiff's hernia belt was contraband and did not have the authority to grant Plaintiff access to his hernia belt. (Exhibit D, ¶6).

101. Defendants Smith and Hastings are not licensed medical professional and cannot prescribe a course of treatment, or overrule a course of treatment by a licensed medical professional. (Exhibit D, ¶8, Exhibit E, ¶6).

102. Defendant Hastings did not personally inspect Plaintiff's personal property or make the initial determination as to what property qualified as contraband. (Exhibit E, ¶4).

103. When responding to Plaintiff's grievance number 045095 complaining of hernia pain,

Defendant Hastings consulted with the Director of Nursing for Pontiac Correctional Center and was told Plaintiff had been examined by a physician who provided Plaintiff with information regarding hernias. Offender Gaddis was told how to request medical services at that time. Based on the information received from the Director of Nursing, Defendant Hastings recommended Plaintiff's grievance be considered moot since he had received treatment for his medical complaint and had been informed how to receive additional treatment as needed. (Exhibit E, ¶5).

104.   Defendants from Pontiac Correctional Center did not have the authority to assign Plaintiff to a lower gallery without a doctor providing Plaintiff with a lower gallery permit. (Exhibit A, p. 49-50).

105.   Defendants Smith and Hastings would have to rely on the policy for property allowed at Pontiac Correctional Center. (Exhibit A, p. 65).

106.   Defendant Maue responded to Plaintiff's October 5, 2007 grievance, and consulted with the Director of Nursing in order to respond to Plaintiff's grievance. Defendant Maue did not review the medical files of Plaintiff, and based her response on the information provided by the Director of Nursing.   (Exhibit J, ¶3).

107.   Defendant Maue is not a medical professional and did not have the authority to issue Plaintiff a low gallery permit or a hernia belt. (Exhibit J, ¶4).

108.   Defendant Maue recommended Plaintiff's grievance be denied based on the statement made regarding his condition by the director of nursing. (Exhibit A, p. 66).

109.   Defendant Maue relied on Nurse Hill's evaluation of Plaintiff's medical condition. (Exhibit A, p. 57).

110.   Defendant Kisro responded to a grievance filed by Plaintiff dated October 5, 2007 through a memorandum dated July 31, 2008. Plaintiff's grievance was returned because it was never received in the grievance office. The memorandum was produced as the result of a conversation with Plaintiff in early June of 2007 when he referred to the October 5, 2007 grievance.  (Exhibit I, ¶3).

111.   If Plaintiff was unsatisfied with the Counselor's response to his October 5, 2007 grievance, he should have forwarded his grievance to the grievance office. (Exhibit I, ¶4).

112.   Defendant Kisro relied upon Defendant Maue's findings when she denied Plaintiff's grievance. (Exhibit A, p. 66).

113.   Defendants from Pinckneyville Correctional Center do not have the authority to prescribe Plaintiff a hernia belt. (Exhibit A, p. 57).

114.   No doctor has ever told Plaintiff that he needs surgery for his hernia. (Exhibit A, p. 47).

115.   Plaintiff has seen Dr. Obadina approximately every 90 days since he was treated by Dr. Obadina on October 5, 2007 at Pinckneyville Correctional Center. (Exhibit A, p. 36).

116.   Terri Anderson is a member of the Administrative Review Board. (Exhibit 61- 2, ¶20).


APPLICABLE LAW

Summary Judgment Standard.

        Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). Further, "[t]he plaintiff cannot merely allege the existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor." *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Specifically, the non-moving party "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Filipovic v. K&R Express Systems, Inc*., 176 F.3d 390, 390 (7th Cir. 1999). Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

Deliberate Indifference Standard.

In order to prove his cause of action, the plaintiff must prove deliberate indifference to a serious medical need. At a minimum, this requires actual knowledge of impending harm which is easily preventable so that a conscious, capable refusal to prevent harm can be inferred from the defendants' failure to prevent it. *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997); *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985). Deliberate indifference is more than mere negligence and approaches intentional wrongdoing. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To establish deliberate indifference, plaintiff must show the defendants ignored a known risk. *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998).

12

Additionally, in order to establish deliberate indifference, plaintiff must show that the physician or other defendants must both have been aware of the fact from which the inference could be drawn that a substantial risk of serious harm exists, and he must actually draw the inference. *Higgins v. Correctional Medical Services*, 178 F.3d 508, 511 (7th Cir. 1999); *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995). The exercise by a physician of his professional judgment does not constitute deliberate indifference. *Youngberg v. Romeo*, 457 U.S. 307, 322-323 (1982).

Medical decisions, such as whether one course of treatment is preferable to another, are beyond the Eighth Amendment's purview. Additionally, the Eighth Amendment is not a vehicle for bringing claims of medical malpractice. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). It should also be kept in mind that inappropriate medical treatment based on pure negligence, or even a series of purely negligent acts is not the same as indifference to a serious medical need. *Sellers v. Henman*, 41 F.3d 1100, 1102-03 (7th Cir. 1994). While a prisoner has the right to medical care, he does not have the right to determine the type and scope of the medical care he personally desires. A difference of opinion between a physician and the patient does not give rise to a constitutional right, nor does it state a cause of action under § 1983. *Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. Col. 1968). *See also, Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006).

Inattention to a medical condition amounts to a constitutional violation only where the medical condition is serious. *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir. 1991). As previously indicated, deliberate indifference may only be found when an official knows of and disregards an excessive risk to inmate health or safety. *See Duane v. Lane*, 959 F.2d 673, 676 (7th Cir. 1992). Deliberate indifference also requires that defendants either intended to harm plaintiff or knew of a risk of harm so significant that an intent to harm could be inferred from a refusal to provide medical care. *See Smith-Bey v. Hospital Administrator*, 841 F.2d 751, 759 (7th Cir. 1988).

The court notes that plaintiff's claim is one in which he is asserting that the Eighth Amendment has been violated. The Eighth Amendment does not require that prisoners receive "unqualified access to healthcare." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); see also, *Hernandez v. Keane*, 341 F.3d 137 (2d Cir. 2003). Rather, inmates are entitled only to "adequate medical care." *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002). Specifically, the Eighth Amendment does not entitle an inmate to demand specific care.

Personal Involvement.

Liability under 42 U.S.C. § 1983 must be based on a defendant's personal involvement in the alleged constitutional deprivation. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Thus, an individual cannot be held liable in a §1983 action unless he caused or participated in an alleged constitutional violation. *McBride v. Soos*, 679 F.2d 1223, 1227 (7th Cir. 1982). Some causal connection or affirmative link between the action complained about and the official sued is necessary in order for a plaintiff to recover under § 1983. *Wolf-Lillie v. Sonquist*, 699 F.2d

864, 869 (7th Cit. 1983).  "Section 1983 will not support a claim based on a respondeat superior theory of liability."  *Polk County v. Dodson*, 102 S.Ct. 445, 453 (1981).  A supervisory official can be liable only for his own misconduct, not that of those under his supervision.  *Duckworth v. Franzen*, 780 F.2d 645 (7th Cir. 1985).  Thus, a supervisory official must be personally involved in the alleged conduct to be liable.  *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).  Corporate defendants may not be held responsible pursuant to a theory of respondeat superior in 1983 actions.

It is well established that § 1983 does not give rise to causes of action based on the doctrine of respondeat superior.  To be held liable for such a claim, a defendant must be personally responsible for the deprivation of a constitutional right.  *See Sanville v. McCautry*, 266 F.3d 724, 740 (7th Cir. 2001).

It appears from plaintiff's complaint that he is attempting to state a cause of action against a private corporation, Wexford Health Sources, Inc., for vicarious liability.  This is not proper. *See Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982).  Corporate liability for deliberate indifference may only be established with evidence of a custom, policy or practice.  As established herein, corporate defendants cannot be held responsible for the acts or omissions of its employees as there is no respondeat superior in 1983 actions.  In order to state a cause of action against a corporate defendant, municipality, or similar entity, the plaintiff must demonstrate that a constitutional deprivation occurred as a result of an expressed policy or custom.  *Jackson v. Illinois Medi-Car, Inc.*, 300 F.2d 760 (7th Cir. 2002).  Other situations in which a corporate defendant may violate the constitutional rights of another as a result of its policies would include the following: (1) an express policy that when reinforced causes a constitutional deprivation; (2) a widespread practice, that although not authorized by written law or expressed policy, is so permanent or well-settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person of final policy making authority.  *Baxter v. Bible County School Corp.*, 26 F.3d 728 (7th Cir. 1994).

DISCUSSION

There is no evidence that any defendant was deliberately indifferent to any serious medical need of the plaintiff.  In this case, the undisputed facts indicate that the plaintiff was regularly seen when he had complaints in regards to his inguinal hernia.  When plaintiff made complaints, he was evaluated by a nurse and referred to a physician if necessary.  Likewise, the plaintiff has no evidence that Wexford Health Sources, Inc. maintains a policy to blanketly deny surgery to inmates suffering from inguinal hernias.  Therefore, summary judgment in this case is proper.

Dr. Zhang

Plaintiff describes Dr. Zhang as an elderly African gentleman.  It is clear the plaintiff has mistaken Dr. Zhang for another physician.  Dr. Zhang is a female of Asian descent.  Furthermore, it is clear from the medical records and from Dr. Zhang's affidavit testimony, that she did not treat the plaintiff at any time while he was incarcerated at the Pontiac Correctional

Center.  Dr. Zhang lacks requisite personal involvement in the allegations made by the plaintiff; therefore, Dr. Zhang is entitled to summary judgment.

Dr. Sylvia Mahone

It is undisputed that Dr. Mahone initially treated the plaintiff on June 13, 2007, while at the Pontiac Correctional Center.  Plaintiff reported to Dr. Mahone that he had been suffering the hernia since May 2006.  Additionally, he reported to Dr. Mahone that he had a hernia belt previously and that it was in his property.  Dr. Mahone found the plaintiff to be suffering from a left inguinal hernia 2 1/2" x 2 1/2".  She also found the hernia to be easily reducible.  At the conclusion of this meeting, Dr. Mahone prescribed the plaintiff Tylenol and ordered the plaintiff be given a hernia belt.

Dr. Mahone next saw the plaintiff on June 19, 2007.  The plaintiff was again complaining that his hernia caused a lot of pain when he was climbing stairs.  As a result, Dr. Mahone granted the plaintiff a low gallery permit for one year to run from June 19, 2007, to June 19, 2008.  Plaintiff made no other complaints regarding his hernia following this visit with Dr. Mahone at the Pontiac Correctional Center.  Plaintiff was transferred to the Pinckneyville Correctional Center on September 23, 2007.

This court and the Seventh Circuit have addressed this exact issue in *Johnson v. Doughty*, 433 F.3d Fed. R. Evid. 296 (7th Cir. 2006).  In *Johnson*, the court found that a physician who evaluated an inmate on multiple occasions for a non-strangulated, non-emergent, reducible hernia was not deliberately indifferent in denying the plaintiff surgery. Further, non-surgical remedies designed to alleviate an inmate's pain from a hernia is not in violation of 8th Amendment.  *Johnson* at 1014.  Here, as in *Johnson*, Dr. Mahone evaluated the plaintiff on multiple occasions and found that plaintiff's hernia did not require surgery.  Each time Dr. Mahone evaluated the plaintiff, the hernia was reducible and could be treated through non-surgical means.  At no time was plaintiff's hernia strangulated while he was at the Pontiac Correctional Center.  In Dr. Mahone's professional opinion, surgery was not required to repair plaintiff's hernia.  The record shows that Dr. Mahone considered the plaintiff's pain into her treatment decisions and based on her physical examinations of the plaintiff, prescribed non-surgical remedies designed to alleviate the plaintiff's pain.  The record in this case indicates that Dr. Mahone's treatment of the plaintiff was grounded in her professional judgment, and that the plaintiff was afforded adequate, reasonable medical treatment.  Consequently, here, as in *Johnson*, summary judgment is appropriate.

Dr. Obadina

Plaintiff was under the care of Dr. Obadina while he was incarcerated at the Pinckneyville Correctional Center.  Plaintiff arrived at the Pinckneyville Correctional Center on September 26, 2007.  On October 2, 2007, plaintiff made complaints regarding his hernia to a licensed practical nurse in the health care unit.  As a result, the plaintiff was referred to the MD call line for October 5, 2007.  On that date, Dr. Obadina saw the plaintiff in regards to his complaints of his inguinal hernia.  Dr. Obadina noted that the hernia was easily reducible even when the plaintiff was standing up. Additionally, Dr. Obadina noticed that the hernia was

non-tender.  At this time, Dr. Obadina's assessment was that the plaintiff did not require a hernia truss to treat his hernia. Dr. Obadina prescribed the plaintiff to take Tylenol as needed for any pain he may experience in regards to his hernia.  Additionally, the plaintiff was ordered to be seen every three months to evaluate and monitor the condition of his hernia.  At that time, in Dr. Obadina's medical opinion, the plaintiff's hernia did not require surgery and was not an emergency situation.  Plaintiff was also seen by a Physician's Assistant on December 27, 2007, in regards to his hernia.  On that date, the plaintiff complained that two weeks prior to the visit, his hernia popped out and he had to push it back in.  The plaintiff was given a full exam by the Physician Assistant.  In the Physician Assistant's assessment, the plaintiff had a small, easily reducible inguinal hernia and ordered the plaintiff follow up with Dr. Obadina as previously planned on October 5, 2007.  As a result, on January 7, 2008, Dr. Obadina again evaluated the plaintiff in the MD call line.  At that time, the hernia was reduced and the plaintiff reported that he continued to be able to reduce the hernia.  Dr. Obadina ordered that the plaintiff return for a follow up visit in 90 days and that he be given Tylenol to be taken as needed for pain.  That was the final visit with Dr. Obadina prior to the plaintiff filing the instant lawsuit.  However, Dr. Obadina continued to evaluate the plaintiff on a regular basis for his complaints regarding his inguinal hernia.  Specifically, Dr. Obadina saw the plaintiff on May 7, 2008.  On that date, plaintiff's hernia remained easily reducible and was uncomplicated.  The plan at that time was to continue to monitor the plaintiff's situation and for him to immediately report to the health care unit if he experiences pain, tenderness, vomiting, or irreducibility.  On November 7, 2008, Dr. Obadina again followed up with the plaintiff in regards to his inguinal hernia.  Once again, the hernia was easily reducible and the plaintiff was educated as to what conditions he should immediately inform the health care unit of.  Plaintiff voiced that he understood and stated that he appreciated the help with his problem.

Plaintiff's hernia has been treated conservatively with pain medication while at the Pinckneyville Correctional Center.  In Dr. Obadina's medical opinion, the plaintiff has not required the use of a hernia belt or truss while at the Pinckneyville Correctional Center.  Additionally, it is noted in the medical records that the plaintiff has been able to work despite his hernia.  During the time that Dr. Obadina treated the plaintiff, in his medical opinion, the plaintiff's hernia did not require surgery.  The plaintiff has regularly been monitored and seen by Dr. Obadina while at the Pinckneyville Correctional Center for his inguinal hernia.  Each time the plaintiff made complaints regarding his hernia, he was given additional pain medication or other medical treatment to address his immediate needs.  In Dr. Obadina's medical opinion, the costs and risks associated with surgery on the plaintiff's hernia outweigh the benefit surgery may provide.

The facts in this case are almost identical to those addressed in the *Johnson* case.  As such, the same conclusion is warranted. Dr. Obadina formed the professional opinion that surgery was not required, and in subsequent visits, Dr. Obadina did not observe any worsening of the condition that would make surgery a medical necessity.  Dr. Obadina's testimony shows that he weighed the risks and rewards of surgery in making his treatment decisions and, given his findings, he prescribed non-surgical remedies designed to alleviate the plaintiff's pain.  Therefore, Dr. Obadina's treatment of the plaintiff was grounded in professional judgment, and

the plaintiff was afforded adequate, reasonable medical treatment.  Therefore, summary judgment in favor of Dr. Obadina is appropriate in this case.

Sandra Hill

Plaintiff's allegations against Sandra Hill revolve around her response to the grievance officer's request for the health care unit to weigh in on response to one of plaintiff's grievances. Specifically, plaintiff, in October of 2007 while at the Pinckneyville Correctional Center, filed a grievance requesting a continued supply of pain relievers and a low gallery permit.  Plaintiff's counselor requested the health care unit provide a response to the plaintiff's grievance.  As such, on November 23, 2007, Sandra Hill, Director of Nursing, authored a memorandum.  Ms. Hill's memorandum stated as follows:

> "Upon review of chart, there is no indication that the offender requested a low gallery permit. The MD addressed the question of the hernia belt. The offender was seen NSC only one time and the problem of pain was not mentioned at that time. That does not qualify as 'chronic pain'. If he wishes to address the low gallery permit or a pain problem, he needs to go through nurse sick call process."

Sandra Hill's response to the plaintiff's grievance is the only involvement she had with the plaintiff's hernia problem.  It is undisputed that Sandra Hill did not treat the plaintiff.  In fact, the plaintiff has never seen Sandra Hill.  Further, Sandra Hill's summation of the plaintiff's chart is accurate.  There is no indication in the medical record that the plaintiff requested a low gallery permit prior to November 23, 2007, at the Pinckneyville Correctional Center.  Additionally, the medical records reflect that Dr. Obadina addressed the plaintiff's question of a hernia belt and made a medical decision that the plaintiff did not need the hernia belt.  Additionally, the medical records do not indicate the plaintiff was complaining of excessive pain.

Ms. Hill's response to the plaintiff's grievance in no way hindered his ability to receive medical treatment while at the Pinckneyville Correctional Center.  In fact, Ms. Hill directed the plaintiff in her response to address the low gallery and pain issues through the nurse sick call process.  There is absolutely no evidence in this case that Sandra Hill had any involvement in the evaluation or treatment of the plaintiff's inguinal hernia.  Additionally, Sandra Hill did not have the authority to issue the plaintiff a low gallery permit or pain medications.  It is undisputed that at all times relevant while at the Pinckneyville Correctional Center the plaintiff was under the care of Dr. Obadina and could request to be seen through the proper channels at any time.

The Seventh Circuit has recently addressed facts similar to these in *Burks v. Raemisch*, 55 F.3d 592 (7th Cir. 2009).  In Burks, the Court found that a public official responding to an inmate's grievance in compliance with their job duty is not in violation of the inmate's constitutional rights.  Here, Sandra Hill was requested by the counselor to review the plaintiff's medical chart and address the complaints in his grievance.  In response, Sandra Hill reviewed the chart, and found no indications that plaintiff's grievance had merit.  As such, Sandra Hill authored the short memo summarizing the contents of the plaintiff's medical chart.  Therefore,

Sandra Hill lacks the requisite personal involvement in the plaintiff's medical care to be found deliberately indifferent.

Further, there is nothing in the record that indicates Wexford maintains a policy to deny surgery to all inmates suffering inguinal hernias.   The plaintiff's allegations against Wexford are twofold: (1) plaintiff alleges Wexford has a policy to not provide surgery on inguinal hernias for inmates in the Illinois Department of Corrections; (2) plaintiff alleges Wexford has a policy of not allowing inmates suffering inguinal hernias to be treated as a chronic issue, thereby alleviating the $2.00 co-pay.

Surgery for Inguinal Hernias.

Initially, plaintiff has no evidence of any policy of Wexford to blanketly deny surgery for inguinal hernias.  Drs. Mahone and Obadina have both testified that they are unaware of any such policy.  Further, both doctors testified that as treating physicians they are allowed to make the decision of whether an inmate with an inguinal hernia is to undergo corrective surgery. Plaintiff also admits that he knows of at least two other inmates that have received surgery on their inguinal hernia at the Pinckneyville Correctional Center.  This admission alone indicates that Wexford does not maintain a policy prohibiting surgeries on inguinal hernias.  On the contrary, plaintiff's admission indicates that inguinal hernias are evaluated on a case by case basis, and surgery is provided where appropriate.

This issue was addressed in *Johnson v. Doughty* by the Seventh Circuit.  In that case, the Court found that the Illinois Department of Corrections and Wexford Health Sources, Inc. did not have an express policy denying surgical intervention on inguinal hernias. The Court in *Johnson* found that the policy of the Illinois Department of Corrections and of Wexford Health Sources, Inc. to evaluate hernias on a case by case basis and provide surgery when the hernia became an acute issue was within the parameters of the 8th Amendment.  The facts of this case produce no reason to disturb the 7th Circuit's decision in *Johnson*.  As such, Wexford is entitled to summary judgment on this matter.

Wexford does not determine the application of the $2.00 co-pay.

The second allegation plaintiff has against Wexford is that he is being charged a $2.00 co-pay for his medical treatment.  Plaintiff believes that his hernia should be treated as a chronic issue thereby relieving him of the obligation of paying a $2.00 co-pay.  However, the $2.00 co-pay requirement is not established by Wexford Health Sources, Inc.  The $2.00 co-pay is established by the Illinois Department of Corrections and the Illinois Administrative Code. Specifically, 20 Ill.Adm.Code 415.30(g) governs the requirement of the $2.00 co-pay.  The $2.00 co-pay was promulgated by the Illinois Department of Corrections with authorization from the Illinois General Assembly. Unified Commercial Code states that the Department shall require a committed person receiving medical or dental services on a non-emergency basis to pay a $2.00 co-payment to the Department for each visit for medical or dental service.  The amount of each co-payment shall be deducted from the committed person's individual account.  A committed person who has a chronic illness, as defined by Department rules and regulations,

18

shall be exempt from the $2.00 co-payment for treatment of the chronic illness. 730 ILCS 5/3-6-2(f).  It is clear from the Illinois Administrative Code and the Unified Code of Corrections that the power to enforce a $2.00 co-payment and to designate a chronic illness lies within the Illinois Department of Corrections.  Wexford does not have the authority to waive or enforce the $2.00 co-payment.  As such, plaintiff's allegation that Wexford policy has somehow violated his rights in regards to a $2.00 co-payment is unfounded.   Further, see *Reynolds v. Wagner*, 128 F.3d 166, 174 (3d Cir.1997)(prisoner co-payment plan does not violate the Eighth Amendment). *See also Hudgins v. DeBruyn*, 922 F.Supp. 144, 150-52 (S.D.Ind.1996) (same); *Martin v. DeBruyn*, 880 F.Supp. 610, 615 (N.D.Ind.1995), aff'd, 116 F.3d 1482 (7 th Cir.1997) (Eighth Amendment guarantees only that inmates receive necessary medical care; it does not guarantee free medical care).   Wexford Health Sources, Inc. is entitled to summary judgment on this issue.

It is undisputed that from the time the plaintiff first alerted health care at the Illinois Department of Corrections of his hernia to the present, it has remained easily reducible. Furthermore, it is undisputed the plaintiff has received numerous physical evaluations and treatment by health professionals and that his condition continues to be monitored.  Dr. Zhang lacks requisite personal involvement in the allegations made by the plaintiff.  Ms. Hill's response to the plaintiff's grievance in no way hindered his ability to receive medical treatment while at the Pinckneyville Correctional Center.  Plaintiff has no evidence of any policy of Wexford to blankety deny surgery for inguinal hernias.  Further, the $2.00 co-pay is mandated by Illinois Administrative Code and Wexford has no control over who is charged the $2.00 co-pay for their visits.

The remaining defendants, Jon Deal, Kerri Mehenkens, Teresa Kisro, Tracy Maue, Brian Fairchild, Terri Anderson, Roger E Walker, Jr, Eddie Jones, John Birkel, Christine Beasley, Steve Smith and Patrick Hastings.  These defendants are also entitled to summary judgment.

Walker and Jones were not personally involved in the alleged violation of the plaintiff's constitutional rights. Liability under 42 U.S.C. §1983 must be based on a defendant's personal involvement in the alleged constitutional deprivation.  *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Thus, an individual cannot be held liable in a §1983 action unless he caused or participated in an alleged constitutional violation.  *McBride v. Soos*, 679 F.2d 1223, 1227 (7th Cir. 1982).  Some causal connection or affirmative link between the action complained about and the official sued is necessary in order for a plaintiff to recover under § 1983.  *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983).  "Section 1983 will not support a claim based on a respondeat superior theory of liability."  *Polk County v. Dodson*, 102 S.Ct. 445, 453 (1981).  A supervisory official can be liable only for his own misconduct, not that of those under his supervision.  *Duckworth v. Franzen*, 780 F.2d 645 (7th Cir. 1985).  Thus, a supervisory official must be personally involved in the alleged conduct to be liable.  *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).  Plaintiff has failed to prove Defendant Walker's personal involvement regarding his claims of deliberate indifference to a serious medical needs.  Plaintiff claims in his Amended Complaint that Defendant Walker was "legally responsible for the overall operation of the Department and each Institution under its jurisdiction." (Doc. 61-2, ¶4). Defendant Walker had no knowledge regarding Plaintiff's complaints regarding his hernia belt

or access to medical care and treatment through correspondence or the grievance process. Plaintiff asserted in his complaint that as Warden of Pontiac Correctional Center, Defendant Jones was "legally responsible for the operation of Pontiac Correctional Center, and the welfare of all the inmates at that facility. (Doc. 61- 2, p. 2, ¶5). Defendant Jones did not have any personal involvement with the facts and occurrences in Plaintiff's complaint. Defendant Jones did not review or respond to Plaintiff's grievances and correspondence, as this task was delegated to a designee. (Exhibit H). Therefore, summary judgment must be entered in favor of Walker and Jones due to their lack of personal involvement in any of the events concerning Plaintiff's claims of deliberate indifference to his serious medical needs.

As non-medical employees, Defendants Hastings, Smith, Kisro, Maue, Fairchild and Anderson, in responding to Plaintiff's grievances, only had a duty to Plaintiff to reasonably respond to his grievances. Defendants Hastings, Smith, Kisro, Maue, Fairchild and Anderson did not have an obligation to do anything beyond their roles in responding to grievances. *In Burks v. Raemisch*, the Seventh Circuit held that, "A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to supply a gratuitous rescue service." 555 F.3d 592, 595 (7th Cir. 2009). Defendants did not have a "free-floating obligation to put things to rights" *Id*. at 595, and cannot be held liable solely for doing their job. The evidence in this case is clear that when responding to Plaintiff's grievances, medical staff was contacted to ensure Plaintiff was receiving medical care and treatment. Defendants are not deliberately indifferent for their inability to overrule policies at their correctional centers regarding low gallery permits or hernia belts, as they did not have the authority to prescribe a course of medical treatment, or overrule policies regarding access to property. Defendants lack the requisite knowledge that Plaintiff faced a substantial risk of serious harm and failed to take reasonable measures. The denial of Plaintiff's grievances by Defendants, or following policies allowing hernia belts and low-gallery permits does not constitute deliberate indifference to Plaintiff's medical needs. Defendant Deal did not determine what property is unauthorized, followed the policies at Pontiac Correctional Center when confiscating Plaintiff's hernia belt, and did not have contact with Plaintiff following the confiscation of Plaintiff's hernia belt such that he would have notice of Plaintiff facing a substantial risk of serious harm. Aside from naming Defendant Mehrkens in the "Defendants" portion of his complaint, Plaintiff makes no specific allegations against Defendant Mehrkens, (Doc. 61-2) and has admitted that he did not determine what constituted unauthorized property.

On Plaintiff's own testimony, no doctor has ever told Plaintiff that he needs surgery for his hernia. Defendants Birkel and Beasley, as CMTs, are not physicians or nurses, and are not trained or licensed to diagnose medical conditions or to prescribe medication or a particular course of treatment, nor do they have the authority to override a treating physician's course of treatment. Defendants Birkel and Beasley, as CMTs, assess offenders who request to be seen by a medical technician. When an inmate requires emergency treatment or care for a chronic condition, the inmate is either transported to the Health Care Unit, or monitored by the facility's physicians in regularly scheduled clinics. Plaintiff was seen by a physician at Pontiac Correctional Center on March 27, 2007 who denied Plaintiff's request for a hernia belt. (Doc. 61-2, ¶42). Plaintiff was issued a lower gallery permit and hernia belt by a physician at Pontiac

Correctional Center on June 13, 2007. (Doc. 61-2, ¶46).  Since his transfer to Pinckneyville Correctional Center, Plaintiff has been seen by a physician approximately every 90 days.  It is not  a constitutional violation that Plaintiff did not like the medical care he received and continues to receive.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's claims of deliberate indifference to his medical needs. Summary judgment is appropriate in this case because the plaintiff has no evidence to suggest that any of the defendants have been deliberately indifferent to his medical needs.

Based on the foregoing:

1.      Pursuant to Fed. R. Civ. Pro. Rule 56(c), the defendants' motions for summary judgment [87] and [89] are allowed.  The clerk of court is directed to terminate the defendants and to close this case its entirety.  The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff.

2.      If the plaintiff wishes to appeal this order, he must file a notice of appeal with this court **within 30 days of the entry of judgment**.  Fed. R. App. P. 4(a)(4).  A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal.  *See* Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.  Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).

Enter this 31st day of March 2010.

\s\**Harold A. Baker**
_____
Harold A. Baker
United States District Judge